## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| RICHARD MURRAY and CORINNE MURRAY, | Case No.: |
| Plaintiffs, | |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT** |
| EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, TRANS UNION LLC, GLOBAL LENDING SERVICES LLC. | |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Richard Murray ("Mr. Murray") and Corinne Murray ("Mrs. Murray") (collectively "Plaintiffs"), by and through the undersigned counsel, bring this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union, LLC ("Trans Union") (collectively, the "CRA Defendants"); and Global Lending Services LLC ("GLS" or "Furnisher Defendant") (all defendants collectively referred to herein as "Defendants"), and state as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal

Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the CRA Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (*i.e.*, retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

10.    The FCRA also requires data furnishers, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.     Plaintiffs' claims arise out of the CRA Defendants' blatantly inaccurate credit reporting, wherein the CRA Defendants falsely reported to Plaintiffs' potential creditors that GLS had charged off an outstanding balance on Plaintiff's auto loan account.

12.     Accordingly, Plaintiffs bring claims against the CRA Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs' credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information the Plaintiffs disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs' credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     Plaintiffs also bring claims against Defendant GLS for failing to fully and properly reinvestigate Plaintiffs' disputes and review all relevant information provided by Plaintiffs and the CRA Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.     As part of this action, Plaintiffs seek actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the FCRA, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

15.    Plaintiff Richard Murray is a natural person residing in New Port Richey, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Plaintiff Corinne Murray is a natural person residing in New Port Richey, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

17.    Defendant Equifax is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Florida, including within this District.

18.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

19.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of Florida, including within this District.

20.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

21.    Defendant Trans Union is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Florida, including within this District.

22.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

23.    Defendant GLS is a financing company that is headquartered in 1200 Brookfield Boulevard Suite 300, Greenville, South Carolina and is authorized to do business in the State of Florida, including within this District.

24.    GLS is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's' claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

27.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

28.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

29.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

30.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information

contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

31.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### Factual Background

32.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

33.     The CRA Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

34.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the CRA Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

35.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the CRA Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

36.     The CRA Defendants' consumer reports generally contain the following information:

(a)     Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)     Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)     Public Record Information: this section typically includes public record information, such as bankruptcy filings; and

(d)     Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

37.     The CRA Defendants obtain consumer information from various sources.  Some consumer information is sent directly to the CRA by furnishers.

38.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the CRA Defendants) to make lending decisions.

39.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the CRA Defendants' consumer reports.

40.    The information the CRA Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

41.    FICO Scores are calculated using information contained in the CRA Defendants' consumer reports.

42.    The CRA Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the CRA Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

43.    The CRA Defendants know that lenders also consider a consumer's debt-to-income ratio ("DTI") before deciding to extend credit or approve financing terms.

44.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

45.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

46.     The CRA Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiffs, without verifying or updating it as required by Section 1681e(b) of the FCRA.

47.     The CRA Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

48.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the CRA Defendants for their inaccurate credit reporting.

49.     Thus, the CRA Defendants are on continued notice of their respective inadequate reporting procedures.  Specifically, the CRA Defendants are on notice

that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

50.    The CRA Defendants have received and documented many disputes from consumers complaining that CRA Defendants reported inaccurate information about them.

**Defendants Falsely Report that Plaintiffs' GLS Auto Loan Was Charged Off**

51.    Plaintiffs previously financed the purchase of a 2019 Nissan Sentra with an auto loan from Defendant GLS.  Plaintiffs were jointly responsible for the loan, and were required to pay off the full balance in monthly installment payments for a period of 72 months.

52.    Plaintiffs timely made each monthly installment payment, as required under the terms of their agreement with Defendant GLS.

53.    Then, on or about March 3, 2023, Plaintiff Richard Murray received an alert from a credit monitoring service indicating that the GLS account was charged off in February 2023.[1]

54.    Plaintiff Richard Murray was shocked because he knew that all monthly payments on the GLS account were timely made.  He also knew that the GLS loan did not mature for several years.

---

[1] As defined in Black's Law Dictionary, the term "charge off" means "[t]o treat an (account receivable) as a loss or expense because payment is unlikely; to treat as a bad debt."  Black's Law Dictionary (11th ed. 2019).

55.     Mr. Murray immediately contacted GLS via telephone to dispute the inaccurate charge off notation.

56.     During the call, a GLS representative informed Mr. Murray that the charge off notation was a mistake or glitch and that the inaccuracy would be corrected.

57.     Upon information and belief, Mr. Murray disputed the inaccurate notation with the CRA Defendants one or more times between the months of March and July of 2023, but those disputes were unsuccessful.

### Mr. Murray's First Dispute to the CRA Defendants
### Regarding the Inaccurate Credit Reporting

58.     Between July and August 2023, Richard Murray submitted disputes to each of the three CRA Defendants.

59.     In or about July 2023, extremely shocked, surprised, and embarrassed at Equifax's inaccurate reporting, Richard Murray disputed the inaccurate charge off notation on the GLS account with Defendant Equifax.

60.     On August 30, 2023, extremely shocked, surprised, and embarrassed at Experian's inaccurate reporting, Richard Murray disputed the inaccurate charge off notation on the GLS account by submitting a written dispute to Experian via USPS Certified Mail.

61.     On August 30, 2023, Mr. Murray disputed the inaccurate charge off notation on the GLS account by submitting a written dispute to Trans Union via USPS Certified Mail.

62.     In each dispute, Mr. Murray explained that the GLS account was not charged off, and that it was inaccurate to report that the GLS account was charged off in February 2023.

63.     Mr. Murray further requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

## Defendant Equifax's Unreasonable Dispute Reinvestigation

64.     Upon information and belief, upon receiving Mr. Murray's July 2023 dispute, Equifax sent Defendant GLS an automated credit dispute verification ("ACDV").

65.     Upon information and belief, Defendant Equifax failed to adequately review all of the information provided by Mr. Murray in support of his July 2023 dispute.

66.     On July 19, 2023, Equifax responded to Mr. Murray's dispute stating that it had completed its investigation and determined that the charge off notation on the GLS account was accurate.

67.     Equifax further informed Mr. Murray that it would continue to report a charge off notation on the GLS account by adding a Status Code of "L" for the month of February 2023.

68.     Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Mr. Murray's July 2023 dispute.

69.     Thereafter, Defendant Equifax failed to correct or delete the inaccurate charge off notation appearing in Mr. Murray's credit file.

70.     Equifax failed to conduct a reasonable reinvestigation of Mr. Murray's dispute tendered July 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Dispute Reinvestigation**

71.     Upon information and belief, upon receiving Mr. Murray's August 30, 2023 dispute, Defendant Experian sent Defendant GLS an ACDV.

72.     In the alternative, Defendant Experian failed to send Defendant GLS an ACDV because Experian falsely labeled the dispute as suspicious.

73.     Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Mr. Murray in support of his August 30, 2023 dispute.

74.     On September 6, 2023, Experian responded to Mr. Murray's dispute stating that it will not be reinvestigating the dispute because it believed the dispute came from an unauthorized third party.

75.     Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Mr. Murray's August 30, 2023 dispute.

76.     Thereafter, Defendant Experian failed to correct or delete the inaccurate charge off notation appearing in Mr. Murray's credit file.

77.     Experian knows that it must treat every dispute as bona fide unless it is deemed to be frivolous.

78.     Richard Murray's dispute was not frivolous.

79.     Experian has taken an unreasonable position and made a flagrantly illegal calculation to disregard consumer disputes by labeling them "suspicious" based on outlier district court cases that are applicable to indirect disputes made by credit repair organizations that the consumers took no part in.

80.     Plaintiff authorized, adopted and participated in the dispute process and included his government-issued identification.

81.     Experian has no cognizable reason to treat his disputes as frivolous or otherwise not subject to the reinvestigation provisions of the FCRA.

82.     Because Experian determined that the Plaintiff's dispute did not come directly from him, it not only failed to promptly conduct a reinvestigation, it failed

to do the bare minimum of forwarding the dispute and all relevant information to Defendant GLS.

83.    Experian failed to conduct a reasonable reinvestigation of Mr. Murray's dispute tendered August 30, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

84.    Upon information and belief, upon receiving Mr. Murray's August 30, 2023 dispute, Defendant Trans Union sent Defendant GLS an automated credit dispute verification ("ACDV").

85.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided by Mr. Murray in support of his August 30, 2023 dispute.

86.    Defendant Trans Union failed to respond to Mr. Murray's August 30, 2023, dispute within the required thirty-day time period.

87.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Mr. Murray's August 30, 2023 dispute.

88.    Thereafter, Defendant Trans Union failed to correct or delete the inaccurate charge off notation appearing in Mr. Murray's credit file in relation to the GLS account.

89.   Trans Union failed to conduct a reasonable reinvestigation of Mr. Murray's August 30, 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### The CRA Defendants' Method for Considering Consumer Credit Report Disputes

90.   The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

91.   The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

92.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

93.   It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

94.   Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately

appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

95.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

96.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

97.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

98.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

99.    The data furnishers, like Defendant GLS, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

100.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as

accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

### Defendant GLS's Unreasonable Dispute Reinvestigation

101.   Upon information and belief, in or about July 2023, Defendant GLS received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Mr. Murray.

102.   Upon information and belief, Defendant GLS failed to review all relevant information provided by Defendant Equifax regarding Mr. Murray's dispute tendered in or about July 2023.

103.   Upon information and belief, Defendant GLS verified the disputed information as accurate to Defendant Equifax on or about July 19, 2023.

104.   Upon information and belief, on or about August 30, 2023, Defendant GLS received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Mr. Murray.

105.   Upon information and belief, Defendant GLS failed to review all relevant information provided by Defendant Experian regarding Mr. Murray's dispute tendered on August 30, 2023.

106.   Upon information and belief, on or about September 6, 2023, Defendant GLS verified the disputed information as accurate to Defendant Experian.

107.   Upon information and belief, on or about September 8, 2023, Defendant GLS received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Mr. Murray.

108.   Upon information and belief, Defendant GLS failed to review all relevant information provided by Defendant Trans Union regarding Mr. Murray's dispute tendered on August 30, 2023.

109.   Upon information and belief, in or about September 2023, Defendant GLS verified the disputed information as accurate to Defendant Trans Union.

110.   Defendant GLS violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

### Mr. Murray's Second Dispute to the Defendants Experian and Equifax Regarding the Inaccurate Credit Reporting

111.   As of September 2023, Defendant Experian was still falsely reporting that the GLS account was charged off.

112.   As of November 2023, Defendant Equifax was still falsely reporting that the GLS account was charged off.

113.   On September 18, 2023, extremely shocked, surprised, and embarrassed at Defendant Experian's inaccurate reporting, Mr. Murray disputed the inaccurate charge off notation with Defendant Experian.

114.   Mr. Murray explained that the charge off notation was incorrect because the GLS account was not charged off in February 2023

115.   On November 16, 2023, extremely shocked, surprised, and embarrassed at Defendant Experian's inaccurate reporting, Mr. Murray disputed the inaccurate charge off notation on the GLS account with Defendant Equifax.

116.   In each dispute, Mr. Murray explained that the charge off notation on the GLS account was inaccurate

117.   Mr. Murray requested that Experian and Equifax reinvestigate the disputed information, correct the reporting, and asked each to send him a corrected copy of his credit report.

## Defendant Equifax's Unreasonable Reinvestigation

118.   Upon information and belief, Defendant Equifax sent Defendant GLS an ACDV in response to Mr. Murray's November 16, 2023 dispute.

119.   Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Mr. Murry in support of his dispute.

120.   Specifically, on November 23, 2023, Defendant Equifax responded to Mr. Murray's dispute and stated that it had verified the accuracy of the charge off notation on the GLS account.

121.   Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Mr. Murray's November 16, 2023 dispute.

122.   Thereafter, Defendant Equifax failed to correct or delete the inaccurate charge off notation appearing in Mr. Murray's credit file.

123.   Defendant Equifax failed to conduct a reasonable reinvestigation of Mr. Murray's dispute tendered November 16, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Reinvestigation**

124.   Upon information and belief, Defendant Experian sent Defendant GLS an ACDV upon receiving Mr. Murray's September 18, 2023 dispute.

125.   Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Mr. Murray in support of his dispute.

126.   Specifically, on September 27, 2023, Defendant Experian responded to Mr. Murray's dispute and stated that it had verified the accuracy of the charge off notation reported on the GLS account.

127.   Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Mr. Murray's September 18, 2023, dispute.

128.   Thereafter, Defendant Experian failed to correct or delete the inaccurate charge off notation appearing in Mr. Murray's credit file.

129.   Defendant Experian failed to conduct a reasonable reinvestigation of Mr. Murray's dispute tendered September 18, 2023, or any reinvestigation

whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Defendant GLS's Unreasonable Dispute Reinvestigation

130.   Upon information and belief, in or about November 2023, Defendant GLS received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Mr. Murray.

131.   Upon information and belief, Defendant GLS failed to review all relevant information provided by Defendant Equifax regarding Mr. Murray's dispute tendered on November 16, 2023.

132.   Upon information and belief, on or about November 23, 2023, Defendant GLS verified the disputed information as accurate to Defendant Equifax.

133.   Upon information and belief, in or about September 2023, Defendant GLS received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Mr. Murray.

134.   Upon information and belief, Defendant GLS failed to review all relevant information provided by Defendant Experian regarding Mr. Murray's dispute tendered on September 18, 2023.

135.   Upon information and belief, on or about September 27, 2023, Defendant GLS verified the disputed information as accurate to Defendant Experian.

136.   Defendant GLS violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

### Mrs. Murray's First Dispute to the CRA Defendants Regarding the Inaccurate Credit Reporting

137.   On   November   16,   2023,   extremely   shocked,   surprised,   and embarrassed at Equifax's inaccurate reporting, Mrs. Murray disputed the charge off notation associated with the GLS account with Equifax, via certified mail.

138.   On   November   16,   2023,   extremely   shocked,   surprised,   and embarrassed at Experian's inaccurate reporting, Mrs. Murray disputed the charge off notation associated with the GLS account with Experian, via certified mail.

139.   On November 29, 2023, Mrs. Murray further disputed the charge off account associated with the GLS account with Trans Union, via certified mail.

140.   In each dispute, Mrs. Murray explained that the charge off notation was inaccurate because the account was not charged off.

141.   Mrs. Murray requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

## Defendant Equifax's Unreasonable Dispute Reinvestigation

142.   Upon information and belief, Equifax sent Defendant GLS an ACDV upon receiving Mrs. Murray's November 16, 2023 dispute.

143.   Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Mrs. Murray in support of her dispute.

144.   By letter dated November 23, 2023, Defendant Equifax rejected Mrs. Murray's dispute and informed her that it would continue reporting a status code of "L" for the month of February 2023 to indicate that the GLS account was charged off in February 2023.

145.   Defendant Equifax also informed Mrs. Murray that it would continue reporting that Mrs. Murray had a past due balance of $22,813 on the GLS account for the months of February and March 2023.

146.   Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Mrs. Murray's November 16, 2023, dispute.

147.   Thereafter, Defendant Equifax failed to correct or delete the inaccurate charge off notation appearing in Mrs. Murray's credit file.

148.   Equifax failed to conduct a reasonable reinvestigation of Mrs. Murray's dispute tendered November 16, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Dispute Reinvestigation**

149.   Upon information and belief, Defendant Experian sent Defendant GLS an ACDV in response to her November 16, 2023 dispute.

150.   Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Mrs. Murray in support of her dispute.

151.   Specifically, Defendant Experian failed to provide any response to the dispute.

152.   As of January 26, 2024, Experian was still reporting that the GLS account was charged off in February 2023.

153.   Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Mrs. Murray's November 16, 2023 dispute.

154.   Thereafter, Defendant Experian failed to correct or delete the inaccurate charge off notation appearing in Mrs. Murray's credit file.

155.   Experian failed to conduct a reasonable reinvestigation of Mrs. Murray's dispute tendered November 16, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

156.   Upon information and belief, Trans Union sent Defendant GLS an ACDV in response to Mrs. Murray's November 29, 2023 dispute.

157.   Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Mrs. Murray in support of her dispute.

158.   By letter dated December 5, 2023, Defendant Trans Union rejected Mrs. Murray's dispute and informed her that it would continue reporting the inaccurate charge off notation on the GLS account for the month of February 2023.

159.   Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Mrs. Murray's November 29, 2023, dispute.

160.   Thereafter, Defendant Trans Union failed to correct or delete the charge off notation appearing in Mrs. Murray's credit file in relation to the GLS account.

161.   Trans Union failed to conduct a reasonable reinvestigation of Mrs. Murray's dispute tendered November 29, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant GLS's Unreasonable Dispute Reinvestigation**

162.   Upon information and belief, on or about November 21, 2023, Defendant GLS received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Mrs. Murray.

163.   Upon information and belief, Defendant GLS failed to review all relevant information provided by Defendant Equifax regarding Mrs. Murray's dispute tendered on November 16, 2023.

164.   Upon information and belief, Defendant GLS verified the disputed information as accurate to Defendant Equifax on or about November 23, 2023.

165.   Upon information and belief, on or about November 20, 2023, Defendant GLS received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Mrs. Murray.

166.   Upon information and belief, Defendant GLS failed to review all relevant information provided by Defendant Experian regarding Mrs. Murray's dispute tendered on November 16, 2023.

167.   Upon information and belief, Defendant GLS verified the disputed information as accurate to Defendant Experian.

168.   Upon information and belief, on or about December 4, 2023, Defendant GLS received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Mrs. Murray.

169.   Upon information and belief, Defendant GLS failed to review all relevant information provided by Defendant Trans Union regarding Mrs. Murray's dispute tendered on November 29, 2023.

170.   Upon information and belief, on or about December 5, 2023, Defendant GLS verified the disputed information as accurate to Defendant Trans Union.

171.   Defendant GLS violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

## Plaintiffs' Damages

172.   Plaintiffs sustained multiple credit denials as a result of the Defendants' persistent and continuous inaccurate reports.

173.   On September 16, 2023, Mr. Murray and Mrs. Murray jointly applied for a Synchrony CareCredit credit card.

174.   By letter dated September 16, 2023, Synchrony denied Plaintiffs' application based on a credit report sold by Defendant Trans Union, citing, among other things, a "[r]ecent charged off account" and "[m]onths since most recent serious delinquency is too short."

175.   On October 7, 2023, Mr. Murray applied for a credit line increase with Chase.

176.   By letter dated October 7, 2023, Chase explained that Mr. Murray's application was denied based on an Experian credit report, which "reflects recent charge off(s) or bad collection(s)."

177.   On October 24, 2023, Mr. Murray applied for an Amazon/Synchrony credit card.

178.   By letter dated October 28, 2023, Synchrony Bank denied Mr. Murray's application based on credit reports it obtained from Trans Union and Experian.

179.   On October 27, 2023, Mr. Murray received a letter from Comenity stating that the credit limit on his Beall's credit card was being decreased "due to a decrease in credit score."

180.   This letter indicated that Comenity was relying upon a credit score provided by Defendant Equifax in arriving at this decision.

181.   This credit limit decrease also affected Mrs. Murray, as the Comenity account was jointly held by both Plaintiffs.

182.   On December 24, 2023, Mr. Murray applied for credit from the Pentagon Federal Credit Union ("PenFed") but was denied.

183.   By letter dated December 24, 2023, PenFed explained that the denial was predicated on an Equifax credit report which showed, among other things, the "occurrence of a derogatory credit event."

184.   On February 4, 2024, Mrs. Murray applied for a Capital One credit card and was approved.

185.   Upon information and belief, Mrs. Murray was approved at less favorable terms because of the inaccurate charge off notation in relation to the GLS account on Mrs. Murray's credit reports.

186.   On February 6, 2023, Mrs. Murray applied for a Discover credit card and was denied that same day due to a credit report provided by Experian.

187.   By letter dated February 6, 2023, Discover explained that Mrs. Murray's application was denied because the Experian report showed, *inter alia*, "serious delinquency" and "too few accounts currently paid as agreed."

188.   Upon information and belief, Mrs. Murray was denied because of the inaccurate charge off notation in relation to the GLS account on Mrs. Murray's Experian credit report.

189.   Plaintiffs reasonably believe that Defendant GLS continued to furnish data to the national credit bureaus inaccurately suggesting that the GLS auto loan account was charged off in February 2023.

190.   Plaintiffs reasonably believe that the CRA Defendants continued to publish an inaccurate charge off notation on the GLS account on Plaintiffs' credit reports.

191.   As a result of the inaccurate charge off notations, the Defendants made it practically impossible for Plaintiffs to obtain credit.

192.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

193.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiffs herein.

194.    As a standard practice, the CRA Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that CRAs may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

195.   The CRA Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the CRA Defendants' violations of the FCRA are willful.

196.   As a result of Defendants' conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to
### Assure Maximum Possible Accuracy
### (First Claim for Relief Against CRA Defendants)

197.   Plaintiffs re-allege and incorporate by reference the allegations set forth in preceding paragraphs as if fully stated herein.

198.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible***

*accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

199.   On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiffs.

200.   Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiffs and ultimately Plaintiff's' creditworthiness.

201.   Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiffs.

202.   Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiffs.

203.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiffs.

204.  As a result of the CRA Defendants' conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

205.  CRA Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

206.  Plaintiffs are entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against CRA Defendants)

207.  Plaintiffs re-allege and incorporate by reference the allegations set forth in preceding paragraphs as if fully stated herein.

208.  The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of

information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The FCRA imposes a 30-day time limit for the completion of such an investigation.  *Id*.

209.   The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

210.   On at least one or more occasions during 2023, Plaintiffs each disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in their credit file that is patently inaccurate, misleading, and highly damaging to them, namely, the inaccurate charge off notation reported on the GLS auto loan account for the month of February 2023.

211.  In response to Plaintiff's' dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's' credit file.

212.  In response to Plaintiff's' dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiffs' credit file.

213.   In response to Plaintiff's' dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's' credit file.

214.   CRA Defendants each violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiffs; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's' credit file.

215.   As a result of CRA Defendants' conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

216.   CRA Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an

amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

217.  Plaintiffs are entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III
### 15 U.S.C. § 1681s-2(b)
### Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer
### (Against Defendant GLS)

218.  Plaintiffs re-allege and incorporate by reference the allegations set forth in preceding paragraphs as if fully stated herein.

219.  Defendant GLS furnished the inaccurate information relating to Plaintiffs to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

220.  Defendant GLS violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's' dispute, or otherwise by failing to fully and properly investigate Plaintiff's' dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiffs to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union; and, by failing to cease furnishing

inaccurate information relating to Plaintiffs to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

221.   As a result of Defendant GLS's conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

222.   Defendant GLS's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

223.  Plaintiffs are entitled to recover attorneys' fees and costs from Defendant GLS in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for the following relief:

i.   Determining that Defendants negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiffs actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiffs reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

### DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 8th day of March, 2024

**CONSUMER ATTORNEYS**

*/s/ Catherine Tillman*
Catherine Tillman, Esq., FL #0057663
CONSUMER ATTORNEYS
8245 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (718) 715-1750
E: ctillman@consumerattorneys.com

*Attorneys for Plaintiffs*
*Richard and Corinne Murray*